Good morning, may it please the court. My name is George Ferides, appearing on behalf of Petitioner Maureen Lawton-O'Ryan in her appeal of the agency's denial for asylum and withholding claims. Petitioner argues that the adverse credibility finding rendered by the agency is not supported by substantial evidence. In particular, I'd like to first point out that the board circumscribed, greatly circumscribed the immigration judge's findings regarding the corroboration issue. In particular, specifically, the board found, only agreed with the immigration judge, that the absence of any, any information from Petitioner's sister-in-law undermined her credibility in this matter. Petitioner... Counsel, let me ask you a couple questions about that. Here's what bothered me about this case and I want to give you a chance to respond to it. First of all, if she thinks things were that bad for her in Fiji, and I know they have been that bad for a lot of East Indians who live in Fiji from time to time in the past, if she thinks that were, things were that bad, I can't see why she'd send her daughters back either. And the fact that she did seems like it is substantial evidence on the record as a whole to sustain the credibility determination. And the second thing that I'm concerned about, and need you to address, is the corroboration. To me, saying I sent the kids back with my sister-in-law because my daughters were sick, and then not putting the sister-in-law on, even though she lives in the United States, not even getting an affidavit from her, it's kind of like in a car not putting on any doctor bills or testimony from doctors or any kind of medical evidence at all. Yes, Your Honor. What I want to say about that is that in this case, Petitioner had to make a choice. She sincerely believed that her children were ill. She couldn't afford to take them to the doctor based on what she... I was in the emergency room Friday. It was full of impecunious people who had no ability to get medical services except by getting other people to pay for them. And there they were getting the same services as me. Yes, Your Honor. But in this case, Petitioner had to rely on the people around her. She had family in the United States. She had an attorney in the United States. She trusted their judgment that she would not be able to get adequate care for her children. So she made the choice to send them back to Fiji and had to weigh the danger between them remaining in the United States between and the danger of returning them to Fiji. She made that choice. And to say now that her claim of past persecution, which has not really been disputed on the record, the testimony she gave regarding the rape she suffered, the beatings that her husband suffered, his abduction, his decision to send them back to Fiji, to send her children back to Fiji because she thought she feared for their health in the United States, I feel is unfair in this case. She's testified unequivocally and consistently with her assignment application about what happened to her in Fiji. And now this issue about whether or not she still fears, whether she still has an objective fear of future persecution in Fiji is not what the immigration judge decided in this case. He simply doubted the veracity of her testimony regarding past persecution simply on various factors which are not substantiated in the record regarding country conditions. Why isn't the stuff that I just mentioned substantiation on the record? We don't actually decide the case. All we do is decide whether there was substantial evidence on the record as a whole, which is a fairly low quantum that allows the I.J. to make the decision he did. Well, I think it's fair to say that the immigration judge and the Board of Immigration Appeals denied this case because they found that her claim of past persecution was undermined by what they considered an absence of future persecution. And that's procedurally improper. The government, the agency must determine first if she's suffered past persecution and then consider the issue of future persecution. They cannot say that what they consider to be a lack of persecution undermines her fear of her, the fact that she suffered past persecution. In this case, they should have given her the presumption and then allowed the government to rebut by whatever evidence they chose to raise on the record, including what this court is now saying about the fact that she returned her children to Fiji. But that's not the issue of credibility, Your Honor. I respectfully state that this is a case where the core of her claim is consistent. How do you get to pass? If her story is true, there's no question she's got past persecution and then she's got a rebuttable presumption. But how do you even get to that if you don't believe what she says? Well, if we're citing the issue that we can't believe her because she sent her kids back to Fiji in light of her testimony about what she feared, what she considered was their serious illness in the United States, that would be tantamount to saying that she should have allowed her children to suffer in the United States just to make her claim more believable. But isn't there – is there nothing that is so illogical as to condemn an argument right on the spot? I mean, I – you know, not to be melodramatic, but I was concerned with the same thing that Judge Kleinfeld was concerned about. I mean, if you get a mother who has escaped the Warsaw Ghetto, for example, with her children and her children are ill in the United States, a mother who would send the children back to the Warsaw Ghetto to be with their father, who is – who is the target of the – the occupier's attention in the first place, I mean, it – it strikes one as so illogical and profoundly misguided that – that it has to affect an immigration judge's view of – of the rest of the story. Yes, Your Honor, but I – I still submit that by doing so, by coming to that conclusion, he still disregarded her testimony, her explanation about why she did this. He claims in the – in his decision that she did – she made this decision to send her children back based on – without reservation, I think, is the word he used. Without reservation, sent her children back. And that is not grounded in the record. The record establishes that she conferred with her family here in the United States, her two brothers, her sister-in-law, that she conferred with her attorney, who – who the record shows has been since disbarred by the State Bar of California. She conferred with these people, and they advised her, you don't have the money, we can't help you with – with the money to – to afford hospital care for your children. You should send them back to – so that they can at least be with their father. And at this point, I would like to reserve some time for rebuttal. Thank you. Good morning, Your Honor. I'm Anthony Newcastle. I represent the Attorney General in this particular case. The evidence of the record does not compel this Court to a finding contrary to that of the agency, that is, the board and the immigration judge, that the Petitioner was incredible. There are four prongs to the agency's determination. I'll address each of them very briefly, subject to the Court's questions. The first is the inconsistent statements slash the inconsistent actions attributed to the Petitioner in this particular case. One has been discussed during my brethren's argument, and that is the inconsistent actions of saying that the children suffered so – such psychological effect from what happened that they were so sick, they're unable to walk. And then, in the next breath, saying, but I sent them back to Fiji with my sister-in-law. Not only is that a dramatic, inconsistent statement to the – that goes to the very heart of her claim, because – Why does it go to the heart of the claim? Because she's – she's claimed – let's break it down. Why does – why is it relevant to past persecution? Your Honor, because the children in her testimony and the actions that she testified to concerning the Fijian Army happened in the presence of her children. Right. That is part of why she said that – she came here with her children, why she said that they were so sick, the psychological effects. Then to turn around and say, well, I'm just going to send them back with my sister-in-law, even though they appeared at the first master calendar for a grant of asylum, and they were there, and their children were being heard, and they were in the procedure – process of being heard by the immigration judge. But after the process had started, she sent them back. Right. And that's the inconsistency that goes to her very claim. Well, let's – let's peel back the onion a layer at a time. I mean, it seems to me her – the first part of the analysis is whether or not she suffered past persecution. There really isn't much doubt that if you believe her, she has. You'd agree with that? Yeah, I think you have to believe the first – that's correct. So why is it inconsistent with her claim of past persecution to say that our – my children have suffered post-traumatic stress, they're psychologically harmed, I'm going to have to send them back? It doesn't really – it may – I can understand your argument how that would undermine or might rebut her claim that she has a fear of future persecution. That part I get. But I don't understand how it goes to the heart of the claim on past persecution. Well, I think, Your Honor, to be able to get to the heart of the claim on past persecution, and I agree with the judges that have mentioned that, you know, if we get past the credibility issue, there's a – there's a – there's certainly a strong case for past persecution. But you must get over that hurdle first. And if – if the claims that she's testifying to are credible and that her daughters were there with knives to their throats, watching the father get killed, someone rape her, then it's illogical, inconceivable that she would send these children back to Fiji with her sister-in-law, who is a legal – a lawful permanent resident in the United States. Her two brothers are here, lawful permanent residents in the United States. It just seems that the options that this petitioner had to – to lend credibility to her past persecution, which is the issue, it just seems illogical that she would send these children back into an environment in which she testified they suffered such psychological trauma they were unable to walk. I understand why that would – that would be relevant as to the issue of whether her – whether a future persecution – in other words, that may well be relevant to rebut her past persecution, the presumption that that – that is created by that. But I don't understand why we should disbelieve her story about the rape because she chose later to send her kids back. The logical explanation may be country conditions have changed. I don't know that. But that would be, I expect, the government's argument. But I just don't understand how – why we should disbelieve her story about the rape and the harming of her husband because she later sends the kids back. I think that it's – they're intertwined in the fact that the children were there. I mean, because her past persecution, how she testified to it, the children were a part of it, which is why she kind of – I mean, they witnessed it. So it's rare that you get a case where these children are there and witnessed it and part of this persecution. In this particular case, they were. I mean, there's no question that she testified that they were there. So that, in turn, certainly has an effect on whether what she claims as the past persecution actually occurred because of her subsequent actions. I don't think you can sort of separate the – what she testified to past persecution and how she acted afterwards in light of this particular case because the children were there. Okay. And we talked about that instance, but you wanted to go through all the inconsistencies. Yes. There's – the other inconsistency concerning – and this also intertwines with when the children were returned – is when our husband was supposedly released from the Fijian army. First, she testified in 2002. But obviously, that would be inconsistent because she sent her kids back and this is what transpired during her testimony when she was challenged on it in 2000 to remain with her father. So obviously, she could not – he could not have been released in 2002. He was already released in 2000. Right. But she corrected herself on the record, didn't she? She corrected herself on the record? After she was challenged on it, yes, Your Honor. I mean, obviously, she could – she had to correct it because she couldn't have said, oh, yeah, I maintained 2002 because her children, she testified, sent back to her father. Could I ask another broad-brush question? Yes, Your Honor. Because I don't deal with immigration cases much as a sitting trial judge, but we give wide – at least the statute gives wide deference to the findings of fact of an administrative panel. And the question that I have – and I don't know any immigration judges, but how many – what percentage of asylum cases are granted in the system, if you know? Your Honor, there was just a very recent study concerning the grants of asylum cases nationwide. And nationwide, I think they're somewhere around the 40 percent, somewhere in that area. But they broke them down even further to immigration judges because of the study that the Attorney General proposed in January of this year concerning – and they broke it even further. So I think when you lump those all together, I believe – and I can't be confident, but I believe it's somewhere around the 40 percent range or maybe even higher than that. That's the number that comes to mind now. But I can certainly get the accurate information. Well, to me, it's a relevant question. There seems to be a lot of distrust of the immigration system among judges generally. And as one who doesn't have a background in the area, I was trying to figure out if there was something about the results or the system generally that justified that distrust. Yes, Your Honor. And I think, obviously, this Court only sees the ones that are not granted, I mean, the ones that are granted. Sure. But the same study showed a wide variance in rates among immigration judges within the same district. That's true. And even wide ranges between the countries, obviously, that asylum applicants come from. But the other instance that I wanted to talk about was the lack of corroborating evidence, because that involves a recent change from the Real ID Act on how this Court looks at now the lack of corroboration evidence, and it's under the substantial evidence test. That is, they must be compelled that that corroborating evidence was not reasonably available at the time. And in this particular case, while the Board ignored the other reasons why the immigration judge gave concerning corroboration evidence, they said those documents may not have been reasonably available to this particular petitioner. But the sister-in-law's testimony or an affidavit from the sister-in-law who returned with the children to Fiji was clearly easily available. She's a lawful permanent resident of the United States, lives in California, could have easily presented something to say, I took the children back, they were distraught, we couldn't give them medical care here, you know, I returned them to the father, the father was in need of something to corroborate this claim. I mean, it was so – I mean, it was so easily available that this petitioner clearly could have come up with something. And unless this Court finds that that finding, that it was reasonably available was wrong and compels the Court to conclude otherwise, then that is in itself enough to sustain an adverse credibility challenge in this particular case. And the other brief inconsistency concerning the physical conditions of a daughter, which I think this Court looked at, whether first she testified they couldn't even walk, and then they said, well, they could walk, but I really couldn't watch her or I couldn't watch them. So that is another inconsistency concerning the conduct, the condition of the daughter and, in fact, the believability of the petitioner's story. The other third point that I didn't hit to was the non-responsiveness. And the best example of that is on page 152 of the record, where the immigration judge is trying to say, well, why did you get – couldn't you have gotten something from your husband, anything? Can you send me something? And she never really – I see my time's up. She never really answered the question concerning why her husband couldn't send her. She kind of said, well, who am I going to – who can he go to? All the immigration judge said, could you have given me something? And while that doesn't go to the cooperation, that just goes to the non-responsiveness. That's all he was asking. Could you have given me something from your husband? And she never really could answer that question quite clearly. Okay. Thank you, counsel. Thank you. Rebuttal. Just quickly, Your Honor. I read the Board's decision as largely reversing the corroboration findings of the immigration judge. And in point of fact, with the remaining documentation that the immigration judge required, he specifically required it for the purpose of supporting Petitioner's testimony regarding past persecution, not because of what the – and also in part because of her trip to Fiji, but mostly primarily based on her past persecution. And I submit that the – that her sister-in-law's knowledge of her past persecution was not direct personal knowledge. It was only hearsay about what she had been told by either Petitioner or her other family members. In fact, she was in the United States of America at the time that Petitioner was being persecuted. And moving on. I don't see that. It seems like the sister-in-law would have testified about what kind of physical condition the kids were in and what her sister-in-law told her about why she was asking her to take the kids back there. I would argue in part, Your Honor, but also – I mean, even if you didn't ask those questions, the government lawyer would have. Say again, Your Honor. Even if you did not ask those questions, the government lawyer certainly would have. About what, Your Honor? Just what I said. What kind of condition were the kids in when you took them back and what did your sister-in-law say to you about why she wanted you to take them back? Yes, Your Honor. But once again, I know we're circling this issue, but these are clearly factors that the immigration judge is using that happened after the testimony she described about what happened to her in Fiji. If the judge wants to know why did you send your – why should I believe your claim about past persecution if you sent your children back to Fiji, I respectfully assert that that's neither here nor there, that the immigration judge must look at the past persecution that she describes and ask, is there anything inconsistent about that aspect of her testimony? But how do we know any of this ever happened? It reminds me of these cases where – dope cases where the government doesn't put the informant on the stand, obviously because they think you'll look like a liar. I'll tell you why, Your Honor, because there's no question about this woman's identity. There's no question that the country condition reports place her claim in context. There's also no question that her testimony about the core of her claim is unequivocal and consistent. The other parts of her claim that have been questioned are things that she doesn't have any direct knowledge about. It's about what happened in Fiji after her husband was released. What are the things are like for them in Fiji? And a slew of other issues, like when the immigration judge says, how do you know something – there wasn't a report in the newspaper after your house was burned. She says, I don't know, but my husband checked. He said the immigration judge found that that was inconsistent. And I see my time is up. Well, the other thing, counsel, I think we ought to make clear, you didn't represent her at that hearing, did you? No, Your Honor. This client was represented by Miguel Gado, who's been disbarred from State Bar, and Ranjer Kong, who's been disbarred by this Court. Thank you, Your Honor. Thank you very much.
judges: Kleinfeld, Thoma, Leighton